**WESTERN CENTER ON LAW AND POVERTY, INC., Plaintiff,**

**v.**

**LEGAL SERVICES CORPORATION, et al., Defendants.**

**Civ. A. No. 84–406.**

United States District Court, District of Columbia.

June 29, 1984.

Nancy G. Scheurwater, Max L. Gillam, Los Angeles, Cal., Irwin Goldbloom, Latham, Watkins & Hills, Washington, D.C., Mary Burdick, Richard A. Rothschild, Los Angeles, Cal., for plaintiff.

Joel P. Bennett, Sherrill R. Spatz, Bennett, Deso, Greenberg & Thomas, Richard N. Bagenstos, Washington, D.C., for defendants.

### MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

### INTRODUCTION

This matter comes before the Court on the motion for a preliminary injunction, filed by the plaintiff Western Center on Law and Poverty, Inc. ("Western Center") and the opposition of the defendants, the Legal Services Corporation ("LSC" or "Corporation") and Donald Bogard, its president.[1] This Court previously granted

---

1. The Los Angeles County Bar Association, the San Diego County Bar Association, the Bar Association of San Francisco, the Legal Services Section of the State Bar of California and the Region VIII Project Directors Association have filed *amicus* briefs in support of the plaintiff's position. *Amicus* briefs in support of the defendants have been filed by the Pacific Legal Foundation, the Conservation Caucus, Inc., Howard Jarvis, the Mountain States Legal Foun-

the plaintiff's motion for a temporary restraining order on June 1, 1984. The Court of Appeals for this Circuit granted the defendants' motion for summary reversal of the June 1 temporary restraining order, concluding "that the plaintiff-appellee has not demonstrated irreparable injury so as to justify the extraordinary injunctive relief entered...." No. 84–5354 (June 15, 1984).[2] Nevertheless, all three members of the Circuit panel supported the majority statement that "[b]ased upon the materials before us, it would appear that [Western Center] is likely to succeed on the merits and the District Court correctly so concluded," and the case was remanded for further proceedings.

The Court has considered the entire record in this proceeding, including the March 12, 1984 Recommended Decision of Judge Ralph Drummond, the independent hearing officer appointed by President Bogard; the April 4, 1984 Final Decision of President Bogard, reversing Judge Drummond; the newly-submitted declarations of Mary Burdick, June 14 and 21, 1984, and Philip Henderson, June 20, 1984, responsible officers of Western Center; and the oral argument of counsel for the parties at the June 22, 1984 hearing on the application for preliminary injunction. The Court determines that the plaintiff is entitled to preliminary relief. The findings of fact and conclusions of law for purposes of Fed.R.Civ.P. 52(a) are set out below.

## FINDINGS OF FACT

1. The plaintiff, the Western Center on Law and Poverty, Inc. provides specialized state support center services for California legal services programs and clients. As a means to this end, LSC has provided the plaintiff with annual grants since 1974, when the Corporation was created by the

dation, and the Gulf and Great Plains Legal Foundation.

**2.** Circuit Judge Ginsburg, in dissent, concluded that the plaintiff had met the requirements for temporary relief in view of the special circumstances of this case.

Legal Services Corporation Act of 1974 ("LSCA" or "Act"), 42 U.S.C. § 2996 *et seq.*

2. The defendants are the Legal Services Corporation and its President, Donald P. Bogard.

3. In late 1979, certain clients of the Western Center asked the Center to assist them in opposing Proposition 9, a highly-publicized initiative in California, sponsored by Howard Jarvis. The announced purpose of the Proposition 9 was to drastically reduce state income taxes. Ex. 49 at ¶ 3; Ex. 13.[3]

4. Later, in 1980 the Western Center submitted a grant proposal to LSC's Regional Office in San Francisco, requesting funding for the purpose of assisting clients in various Proposition 9 activities. Exs. 1–4, 8.

5. The Regional Office urged the Corporation to approve the grant application if its General Counsel concluded that the activities could be funded under the Act. Mario Lewis, the then General Counsel of the LSC, reviewed the grant and concluded that the types of activities listed in the grant proposal were legal. Exs. 16, 17. In March of 1980, the Corporation made a grant of $61,665 to the Center. Ex. 1–5.

6. The Corporation became aware of the Center's use of the Proposition 9 grant as early as late 1980, when Alan Rader, an employee of the Center, described those activities at a meeting of LSC employees and officers in San Francisco. Exs. 16, 49. On basis of that presentation, the Corporation invited Mr. Rader to give the same speech at a second meeting of LSC officials in Denver, Colorado, in January of 1981. *Id.;* Ex. 1–3.

7. The Western Center activities which are the subject of this litigation were evaluated and approved by the LSC. Shortly thereafter, the LSC praised the Center for

**3.** All of the exhibits cited in this Memorandum Opinion are included in the administrative record, filed by the defendants on May 3, 1984.

the services provided to its indigent clients and also praised the Center's support activities. In the several years prior to 1984 the Center has received annual commendations from the Corporation. Exs. 24, 25, 55, 54. This praise has been confirmed by numerous legal services organizations, judges, bar leaders, public officials and private attorneys. Ex. 66; Vol. 5, Admin. Record (Declarations and Letters at 1–334).

8. On September 19, 1983, the General Accounting Office ("GAO") issued a report to Senator Orrin Hatch, who had requested the GAO to conduct an investigation of LSC activities in order to determine whether there had been violations of the Legal Services Corporation Act. The GAO report was limited entirely to reviewing selected documents provided by Senator Hatch. The GAO also noted that it was requested by Senator Hatch to issue an interim report within a short time frame. Ex. 1–1.

9. The General Accounting Office report concluded, among other things, that although some of the activities of the Western Center undertaken in 1980 exceeded the limits of permissible activity under the Act, the Corporation could not recoup these funds because it had encouraged the Western Center to undertake the activities. The GAO also concluded that the Corporation should issue clearer regulations to prevent future improper expenditures of federal funds. Ex. 1–1.

10. In October of 1983, the Center applied to the Corporation for renewal of its 1983 state support grant, equaling $860,-000. Under the funding formula specified in Pub.L. 98–166, covering appropriations for fiscal year 1984 operations, the plaintiff would have been entitled to a 14.1 per cent increase over its 1983 grant.

11. On November 28, 1983, LSC's Director of the Office of Compliance and Review requested the General Counsel of the Office of Personnel Management ("OPM") to investigate whether the Proposition 9 activities of Alan Rader and other Western Center attorneys violated the Hatch Act, 5 U.S.C. § 1501 *et seq.*, and offered the LSC's services to "cooperate fully in any investi-

gation you deem appropriate." Ex. 2. The letter was accompanied by several supporting documents, including the September 19, 1983 GAO report previously sent to Senator Hatch. On January 26, 1984, the Special Counsel for Prosecution, Merit Systems Protection Board, responded on behalf of the OPM to the LSC request. The Special Counsel opined that the Proposition 9 activities did not violate the Hatch Act. Ex. 62.

12. On January 4, 1984, more than 3 years after the Center's Proposition 9 activities concluded and after a change in presidential administration, the LSC first notified the Center that its activities were in violation of the Act, and informed the Center that its request for 1984 funding would be denied. Ex. 1.

13. The Center made a timely written request for review of this initial decision pursuant to 45 C.F.R. Parts 1606 and 1625. LSC selected the Honorable Ralph Drummond, a retired California state judge, to serve as an independent hearing officer and to conduct the requested hearing.

14. At a pre-hearing conference held before Judge Drummond, the Western Center made certain documentary evidence, including declarations, available to the LSC. The parties agreed that the Corporation's attorney would review those declarations. If he contested any of the declarations, he could then request the presence of the declarants for deposition or cross-examination. Transcript of Feb. 27, 1984, pre-conference hearing, at 8–11, 19, 25.

15. On February 29, 1984, the hearing was held before Judge Drummond. The Corporation elected to rest its case on the documentary evidence and declarations in the record, and to forego cross-examination or deposition of the Center's declarants. The Corporation did, however, object to the introduction of certain exhibits, including Exhibits 18, 45 and 46. Judge Drummond found that Western Center's activities "on behalf of clients opposed to Proposition 9 consisted primarily of gathering information on the potential effects of Proposition 9 and explaining the information to clients

and local legal services attorneys"; that the Center did not express its opposition to Proposition 9, did not tell anyone how to vote, did not engage in voter registration activities, and did not transport voters to the polls. Findings of Fact at ¶ 9. These factual findings have not been challenged by the defendants. On March 12, 1984, Judge Drummond determined that the Corporation's decision to deny refunding was "substantially without merit." Conclusions of Law at ¶ 23.

16. On April 4, 1984, President Bogard reversed Judge Drummond's decision. Although Mr. Bogard apparently found fault with few factual findings in the recommended decision, he made additional factual findings which were not included below. In sum, Mr. Bogard concluded that the activities which Western Center engaged in were in flagrant defiance of the Act.

17. By the end of June 1984, the Western Center will have available approximately $50,000 to meet its expenses. At present, the monthly expenses of the Western Center are approximately $115,000, and the annual budget of the Center is approximately $1.3 million. Declarations of Mary Burdick (Executive Director), June 21, 1984, and June 14, 1984; Declaration of Philip Henderson (Director of Administration and Treasurer), June 20, 1984.

18. The Western Center is currently providing assistance to eligible low-income clients in more than fifty matters pending throughout the California court system. Most of the cases of the Western Center involve complex and protracted litigation for which legal services attorneys have asked for assistance because they are not able to handle these cases without Western Center co-counsel. Burdick Dec., June 21, 1984; Ex. 12.

## CONCLUSIONS OF LAW

Under the familiar standard for injunctive relief set forth in this Circuit, a preliminary injunction is appropriate:

When a serious legal question is presented, when little if any harm will befall other interested persons or the public

and when denial of the order would inflict irreparable injury on the movant.

*Washington Metropolitan Area Transit Comm'n v. Holiday Tours,* 559 F.2d 841, 844 (D.C.Cir.1977) (interpreting *Virginia Petroleum Jobbers Association v. FPC,* 259 F.2d 921 (D.C.Cir.1958). After considering the merits of the plaintiff's claim and balancing the equities in this case, the Court concludes that the plaintiffs are clearly entitled to the relief which they seek.

First, the plaintiffs have presented a formidable case on the merits, even under the strict standard for relief established in *Virginia Petroleum Jobbers Association,* 259 F.2d 925 (finding of likelihood of success requires strong showing that movant is likely to prevail on the merits). Although the numerous deficiencies in President Bogard's decision need not be exhaustively catalogued, a few examples serve to illustrate that the decision to deny refunding to the Center was arbitrary and capricious.

In his decision, President Bogard conceded the applicability of the Corporation's regulations at 45 C.F.R. § 1625.9 to the respective burdens of proof of the parties. In finding that Western Center had not met its burden of proof, however, Bogard failed to properly apply the burden of proof applicable to the Corporation. Section 1625.9 specifically provides that:

The Corporation shall have the obligation of proving, by a preponderance of the evidence contained in the record, any disputed fact relied upon by the Corporation as justification for denial of refunding; with respect to all other issues, the recipient shall have the obligation to establish that the Corporation lacked a substantial basis for denying refunding.

Despite his largely unexplained rejection of the plaintiff's evidence that the Corporation expressly sanctioned the Center's Proposition 9 activities, Bogard failed to mention the requirement that the Corporation prove disputed factual issues by a preponderance of the evidence. Bogard Decision at 4, 8. This omission is particularly

troubling in light of the defendants' assertions of the relevance of disputed material facts to the resolution of this case. *See, e.g.,* Defendants' Opposition at 2 n. 3, 10.

In reversing Judge Drummond's decision, President Bogard also relied on the GAO report which indicated that both the Corporation and the Western Center had violated certain restrictions in the Act. The GAO report, however, does not substantiate Mr. Bogard's decision to defund the plaintiff. Although the report did discuss the Center's Proposition 9 activities, the evidence it reviewed was limited to "documents and other materials that [Senator Hatch] obtained from [LSC] files and turned over to [the GAO]." Ex. 1–1 at 1. In addition, the report did not purport to find a "significant" or "substantial" violation of the Act, the standard which the LSC regulations require before the Corporation may invoke the drastic remedies which it has applied against Western Center.

More significantly, while President Bogard on the one hand refers to the conclusion of the report which lends some support to his decision that the Center exceeded the restrictions in the Act, he never mentions the ultimate conclusion of the Report: that the government cannot recoup the amount of the Proposition 9 grant because the Center's activities were encouraged and authorized by the Corporation. Since the GAO concluded that the government could not recoup approximately $60,000 in funds, the Corporation's refusal to renew a grant equaling nearly one million dollars is unwarranted.

With respect to its suggestion that the Center should not be punished, the GAO report also stated that:

> By separate correspondence, we are recommending that the Corporation take appropriate action to amend its regulations governing the activities of fund recipients and Corporation officials in order to prohibit such expenditures in the future.

*Id.* at 16. This recommendation only makes sense if the GAO also determined that the existing statutes and regulations did not adequately define prohibited activi-

ties under the Act. Under these circumstances, the plaintiff has shown a strong likelihood of success of establishing their claim that President Bogard's decision is contrary to law.

More importantly, President Bogard's refusal to seriously consider the importance of Western Center to the California legal services community is very disturbing in view of the mandate of the Act and the minimal dollar amount of the Proposition 9 grant compared to the numerous exemplary services rendered by the Center both before and after the alleged violations. Moreover, the regulations suggest that exemplary performance is relevant to a decision to terminate or defund a recipient. The LSC regulations emphasize conciliation and negotiation of disputes between the LSC and its grantees over the use of Corporation funds, 45 C.F.R. §§ 1618.5, 1625.-3(b), (c), and comments thereto, and a decision to grant refunding may be made subject to certain conditions and modifications. 45 C.F.R. § 1625.10(2). Of course, LSC is not required to grant refunding subject to certain restrictions, but President Bogard's decision completely ignores this option. In fact, LSC never informed the Center of the purported violations which occurred more than three years earlier until Bogard sent a termination letter to the Center in early 1984.

Lastly, Mr. Bogard's predictions about the large amount of time *other* LSC-funded projects spent opposing Proposition 9 are purely conjectural and irrelevant to whether the Center is guilty of the violations charged. Bogard Decision at 13. These statements, if taken seriously, would seem to require defunding or termination of *every* LSC-funded program in California in existence between 1979–1980, which now seeks or utilizes LSC funds. In this light, the Corporation's decision to concentrate its defunding efforts on the Center is both arbitrary and capricious.

Second, the plaintiff has demonstrated that, absent the requested relief, it will suffer irreparable injury. By submitting affidavits from Mary Burdick, the Executive Director of the Center, and Philip Hen-

derson, the Center's Director of Administration and Treasurer, the plaintiffs have satisfied the Court of Appeals' concern that the Center demonstrate something more than temporary economic injury. These submissions establish that after the Center meets its obligations to the June payroll and pays other miscellaneous debts, it will have approximately $50,000 remaining in its special purpose bank account at the end of June. Given the Center's estimated monthly expenses of $115,000, Burdick Dec., *supra*, the Center's remaining funds will be depleted before mid-July, absent preliminary relief.

In addition, common sense suggests that the uncertainty surrounding the Center's imminent bankruptcy would have an immediate, negative effect on the ability of its staff to meet its numerous legal commitments. This injury cannot be compensated for by relief at a later stage of the proceedings. *Holiday Tours, Inc.*, 559 F.2d at 843, n. 2 (quoting *Virginia Petroleum Jobbers Ass'n*, 259 F.2d at 925).

Third, and last, the equities favor an injunction because the public and other interested persons, including the defendants, will benefit from the Center's continued provision of superior services, and would suffer significant harm if the Center ceased its existence.